03-75163

Attach 1-3    13 pgs.
w/draw 2/11/04

99 F.3d 1139 (Table)
**Unpublished Disposition**

(Cite as: 99 F.3d 1139, 1996 WL 599821 (6th Cir.(Mich.)))
**C**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

Larry E. SAMMS, Plaintiff-Appellant,
v.
QUANEX CORPORATION, Defendant-Appellee.

No. 95-2173.

Oct. 17, 1996.

On Appeal from the United States District Court for the Eastern District of Michigan, No. 95-60016; George LaPlata, Judge.

E.D.Mich.

AFFIRMED.

Before: MARTIN, Chief Judge;  CONTIE, Circuit Judge;  and CARR, District Judge. [FN*]

> FN* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

PER CURIAM.

**1 Larry E. Samms appeals the district court's order granting his former employer's motion to dismiss his ERISA, age discrimination, tort, and rescission claims based on a general release signed by Samms shortly after his termination. Samms also appeals the district court's decision to deny his motion for leave to file an amended complaint.

Larry E. Samms was employed as a general foreman of Cold Draw Operations at the Michigan Seamless Tube Division of Quanex when, on August 31, 1992, he was terminated. On September 17, Samms signed a Release and Memorandum of Understanding and a supplemental Letter of Agreement. It provided that Samms:

> forever and fully ... release[d] and forever

discharge[d] Quanex ... of and from any and all attorneys' fees, costs, claims, judgments, debts, causes of action, grievances, demands and proceedings of any kind, at law or in equity, including but not limited to claims for damages for discrimination (including claims of age discrimination under the Age Discrimination in Employment Act, as amended, and applicable state law), breach of contract, personal injury, defamation and emotional harm that Employee has claimed, could claim, or may claim against Quanex in any state or federal forum, whether administrative or judicial, resulting or to result, from the acts, omissions, conduct or otherwise of Quanex up to the present date, including, but not limited to, all claims arising out of Employee's employment with Quanex and the termination of that employment relationship.

The stated intent of the Agreement would:

> irrevocably bar any action or claim whatsoever by Employee against Quanex for any resultant injuries or damages, whether known or unknown, sustained or to be sustained, as a result of any of Quanex's acts, omissions and conduct having occurred up to the present date including, but not limited to, Employee's employment with Quanex and the termination of that employment. [FN**]

> FN** Release, ¶ 9.

The Release also stated that Samms *voluntarily* resigned his employment with Quanex on August 31, 1992.

In exchange for signing the Release, Samms received a substantial benefits package. Specifically, Quanex awarded Samms with outplacement services, valued at $7,013.00, extended dental and eye care coverage, $54.29, three months' pay, less normal employee withholdings, $14,610.00, and additional severance pay for Samms' home purchase, $530.00. The total consideration given Samms when he signed the Release was $22,207.29. Samms at no time returned the consideration he received for signing the Release.

On October 14, Quanex notified all retirees, including Samms, that the company was modifying its group benefit health care plan. The new program required retirees to pay a portion of their health care premiums. Beginning in 1993, Quanex deducted money from retirees' pension benefits in order to cover the retirees'

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

new obligation. Samms paid $196.44 per month in 1993, $202.52 per month in 1994, and $238.50 per month in 1995, as a result of this co-pay plan.

**2 After living with the co-pay plan for more than two full years, Samms filed suit against Quanex on January 26, 1995. In his complaint, Samms contends that the Release he signed was invalid. He alleged Quanex was seriously considering the co-pay plan when the release was executed and thus breached fiduciary duties owed to him pursuant to 29 U.S.C. § 1104 of the Employee Retirement Income Security Act of 1974 and that Quanex has interfered with rights protected by ERISA.

On March 8, Quanex moved under 12(b)(6), and asked for a stay of discovery. Samms moved then to file an amended complaint. It sought to: (a) add Quanex's pension and health plans as defendants in Counts I and II of the complaint; (b) amend Count I of the complaint to request equitable relief only and drop his claim for damages; (c) add a claim for rescission and cancellation of the Release; and finally (d) allow Samms to tender back part of the consideration he received in exchange for the Release, but not the full amount and no actual tender was sent.

The district court granted Quanex's motion to dismiss Samms' complaint in its entirety as well as denying his motion. Here, Samms challenges that order.

We review de novo. Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir.1995).

Although Samms did not waive rights or claims that may arise after the date this Agreement was executed, paragraph nine of the Release clarifies the intent of the parties to waive all claims against Quanex up to the execution date of that document. Samms maintains that the district court should not have dismissed his state law claims and his ERISA claims because those claims did not arise until after Samms signed the Release. According to Samms, his claims do not arise until they "accrue" under the applicable statutes of limitations for the various claims. Accrual, he asserts, falls after the date he signed the Release for all of his claims.

Quanex accuses Samms of trying to obscure the plain language of the contract and the intent of the parties. The Release, Quanex argues, does not mention accrual at all. Rather, the plain language of the contract reflects the intent of the parties to absolve Quanex of liability for all conduct that occurred prior to the date of the Release.

A basic rule of contract interpretation is to strive to give effect to the intent of the parties. The plain language of the contract is controlling on that point. The critical language is contained in paragraphs eight and nine of the Release. Samms waived claims "whether known or unknown, sustained or to be sustained, as a result of any of Quanex's acts, omissions and conduct having occurred up to the present date."

There is no possible reading of that language which is consistent with Samms' claim that he did not waive claims of which he was unaware at the time he signed the Release. To adopt his interpretation would necessarily mean that entire portions of the release should be disregarded. It is clear from the language of the contract that Samms negotiated and entered this express agreement to release all claims. Samms was aware of the actual scope of the release, regardless of whether he was aware of specific prospective claims at the time of signing.

**3 Relying on the Michigan Supreme Court case Stefanac v. Cranbrook Educ. Community, 458 N.W.2d 56 (1990), the district court barred Samms from challenging the Release. The tender back doctrine adopted in Stefanac requires that a plaintiff return all the consideration recited in a settlement agreement before or at the same time he commences a proceeding raising a legal claim challenging the agreement. The Fifth Circuit Court of Appeals has adopted this same rule. Wittorf v. Shell Oil Co., 37 F.3d 1151 (5th Cir 1994).

Samms challenges the applicability of the tender back rule to the facts of this case. He claims, as a matter of contract interpretation, that the ERISA claims and the state law rescission claims were not covered by the Release. The tender back of consideration received for signing a release is an absolute prerequisite to avoidance of the release under Michigan and federal law, even where, as here, a plaintiff alleges that he was fraudulently induced to sign the release, or that the opposing party concealed information prior to the release. Wittorf, 37 F.3d 1151 (5th Cir 1994); Dresden v. Detroit Macomb Hospital Corp., 1996 WL 520293. The plain language of the Release makes clear that Samms exonerated Quanex from all claims.

There are times when, as a matter of public policy, courts have refused to apply the tender back doctrine. The Michigan Court of Appeals recognized one exception in Barke v. Grand Mobile Home Sales, 149

N.W.2d 236 (1967), when it allowed a retired widow to proceed with a recession claim without first tendering back the trailer home in which she lived. Here, Samms works part- time as a driver and his wife works full-time as a clerk.   Samms also runs a profitable second-hand shop. *Barke* is distinguishable from these facts. Additionally, the former public policy exception that suggested that ERISA claims are immune to waiver has been thwarted by our decision in *Miller v. Gen. Motors Corp.,* 845 F.2d 326 (6th Cir.1988) (specifically approving the waiver of ERISA rights).

Samms is bound by the terms of the Release.   Under the tender back doctrine, Samms needed to return the consideration he received in order to challenge the Release.   Though Samms insists that he was entitled to retain some of the consideration, he has yet to return *any* part of the consideration he received.

Because the Release does not bar future claims, much of this case revolves around issues of timing.   Samms fails to distinguish between the conduct giving rise to a cause of action and the discovery of that conduct. Samms alleges that the Release impermissibly attempts to release an ERISA fiduciary (Quanex) from liability for future conduct.   Also, Samms cites *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259 (6th Cir.1988), arguing that claims of which he was unaware are not subject to the Release.   Samms misses the critical language in *Forry* that highlights the importance of the intent of the parties and the plain language of the contract. *Id.,* at 263.   *Forry* only applies where it appears that the parties did not contemplate the release of a certain claim.   Samms contemplated and understood that this release covers claims based on any conduct occurring before   execution,   even   those   hypothetical circumstances he was unaware of at the date of execution.

**4 We AFFIRM.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21488690 (E.D.Mich.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Northern Division.

Earl LARREMORE, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE COMPANY,
Defendant.

No. 02-10153-BC.

June 23, 2003.

Barry F. Keller, Ann Marie Pervan, Keller &
Avadenka, Bloomfield Hills, MI, for plaintiff.

David M. Davis, Hardy, Lewis, Birmingham, MI, for
defendant.

*OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO AFFIRM ADMINISTRATIVE DECISION*

DAVID M. LAWSON, District Judge.

*1 This case presents the question whether an ERISA
plan administrator properly relied on a waiver of
Extended Disability Benefits which was given as part
of a settlement of a workers' compensation claim in
denying the plaintiff's later request for those benefits.
The defendant has filed a motion to affirm the plan
administrator's decision, and a related motion for
summary judgment. The plaintiff has responded to the
defendants' motions, but has not filed any cross-
motions.

I.

The administrative record and the parties' separate
proposed findings of fact, in which they substantially
concur, disclose the following facts. In February, 2000,
the plaintiff filed his Application for Mediation or
Hearing with the Bureau of Workers' Disability
Compensation contending that he suffered a work-
related injury when he developed an emotional
disorder due to a confrontation with his superintendent.
At that time, the plaintiff was employed by General
Motors Corporation at its GM Lake Orion facility. *See*
A.R. at 135. On March 2, General Motors filed its
Answer to the Application denying liability. *Id.* at
136-39.

The plaintiff has last worked for General Motors on

May 11, 1999. He had received Sickness and Accident
Benefits under the General Motors Life and Disability
Benefits Program through October 13, 1999. On that
same date, the plaintiff began receiving Extended
Disability Benefits ("EDB"). The amount of the
monthly EDB payments was initially reduced by Social
Security Disability benefits and on March 1, 2000,
EDB was further reduced by an estimated disability
pension benefit. These reductions are authorized by the
Program and not contested in this litigation. Effective
March 1, 2000, the plaintiff was entitled to receive
$571.01 per month in EDB. *Id.* at 186-88.

By January 17, 2001, counsel for the plaintiff and
counsel for General Motors had negotiated a settlement
of the Workers' Compensation claim calling for a
redemption in the amount of $40,000. On March 1,
2001, after General Motors had approved the
settlement, Attorney McNally, who represented GM,
advised Attorney Barry Keller, representing the
plaintiff, that the settlement could proceed and
enclosed the necessary documents to be signed by the
plaintiff. *See* McNally Letter and attachments, A.R. at
140-44. Those settlement documents included the
Agreement to Redeem Liability, the EDB Waiver
Form, a resignation form, and the proposed
Redemption Order. The EDB Waiver form provided:
"I, Earl R. Larremore, agree to waive any EDB benefits
I might be entitled to receive as additional
consideration for the settlement of my workers'
compensation case for $40,000." Attorney Keller was
provided with the documents that were to be executed
at the Redemption hearing a week in advance,
including the EDB Waiver.

The plaintiff signed the settlement documents on
March 8, 2001. Attorney Keller witnessed the
plaintiff's signature on those document, including the
EDB waiver. The Redemption hearing took place
before Bureau of Workers' Disability Compensation
Magistrate Wierzbicki on that same date. A transcript
of those proceedings has been included in the
Administrative Record filed by the defendant. *See* A.R.
at 145-62. As reflected in the transcript, the Magistrate
reviewed the medical reports and deposition testimony,
the plaintiff was questioned regarding the settlement,
and the settlement was approved. Hearing Tr. at 4-5,
16, A.R. at 148-49, 160. The plaintiff was specifically
advised that he had fifteen days to ask that the
settlement be set aside. Hearing Tr. at 9, 14-15, A.R. at
153, 158-59. Attorney Keller witnessed the EDB
Waiver Form. Neither the plaintiff nor his attorney
sought review of the Redemption Settlement within the
fifteen-day period.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21488690, *1 (E.D.Mich.))

Page 6

*2 On March 30, 2001, Attorney Keller wrote to Attorney Berge (GM's attorney at the settlement hearing), and requested that the EDB Waiver be revoked. Attorney Keller premised his request on an alleged "misunderstanding at the time of the Redemption" and his contention that the plaintiff had inadvertently signed the Waiver of EDB. On April 6, 2001, Attorney Berge responded to Keller, advising that General Motors was not willing to revoke the waiver.

Attorney Keller next wrote to Defendant MetLife on May 29, 2001. Keller explained that the plaintiff had "inadvertently and mistakenly signed a document waiving his rights to extended disability benefits." Keller, apparently disregarding the plaintiff's receipt of $40,000, further contended that there was no consideration for such waiver. See A.R. at 169. MetLife responded to Keller's letter on December 31, 2001, explaining that the GM Program was self-funded, that it served as the Claims Administrator, and that EDB benefits were reduced by Social Security Disability Benefits, GM pension and retirement benefits, and Workers' Compensation benefits. MetLife further explained that it had been furnished the EDB Waiver and as a result, EDB was not payable beyond the date of the redemption settlement. Id. at 186-88.

The parties dispute the nature of the "Waiver" referred to in the transcript of the Redemption proceedings. MetLife contends that said Waiver is the same EDB Waiver discussed above. The plaintiff states that the transcript plainly reflects that his client did not agree with the Waiver in question, see Tr. at 15, A.R. at 159, and that the plaintiff understood that all but $100 of his settlement was allocated to future medical payments to prevent a pension offset, Tr. at 9, A.R. at 153.

The parties agree that MetLife was not a party to the redemption settlement.

II.

The plaintiff contends that the Court should disregard the EDB waiver because it was signed under a "mutual mistake" of fact. Accordingly, the plaintiff argues, he should be receiving his EDB under the express terms of the plan. The defendant counters that if the waiver was mistakenly signed, there was no "mutual" mistake, since the EDB would have been substantially reduced by any workers' compensation payments the plaintiff may have won and waiver of the extended benefits was a material part of the settlement and redemption of the workers' compensation claim. The defendant also

argues that the plaintiff may not now attempt to repudiate the waiver--an integral part of the settlement-- without first tendering back the consideration. Next, MetLife points out that the plaintiff's dispute over the workers' compensation settlement should be directed to General Motors. MetLife is merely the plan administrator and was not a party to the arrangement which yielded the EDB waiver. For all these reasons, MetLife insists that it was entirely reasonable for it to rely on the EDB waiver when deciding to deny the plaintiff's request for Extended Disability Benefits.

*3 There is no dispute that the GM Plan is an "employee welfare benefit plan" under ERISA, see 29 U.S.C. § 1002(1), that the plaintiff's cause of action is one for benefits under Section 502(a)(1)(B) of ERISA, and that this Court is limited to the evidence presented to the plan fiduciary. The parties also agree that a deferential standard of review applies to the plan administrator's decision in this case. When applying this standard, the Court must determine whether the administrator's decision was reasonable in light of the available evidence. Put another way, if there is a reasonable explanation for the administrator's decision in light of the plan's provisions, then the decision was not arbitrary and capricious. Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir.1997); Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir.2000). The question presented for the Court to decide, therefore, is whether the defendant's refusal to pay long-term disability benefits to the plaintiff after the plaintiff's execution of the EDB Waiver form was arbitrary and capricious. Given the standard of review, this is not a close case. The denial of benefits after March 8, 2001 was not improper.

The defendant has correctly cited the law of accord and satisfaction. "An accord and satisfaction is a separate and new contract that operates to discharge or terminate an existing debt. The prior debt is discharged by a performance different from that which is claimed as due, and acceptance of such substituted performance." Baum's Dairy Farms, Inc. v. United States, 996 F.Supp. 705, 711 (E.D.Mich.1998). Once tender has been made in "accord" with the parties' settlement agreement, consideration has been exchanged and the agreement cannot be rescinded. Bowater North Am. Corp. v. Murray Mach. Inc., 773 F.2d 71, 75 (6th Cir.1985). In an unpublished decision, the Sixth Circuit applied the common law of accord and satisfaction as followed by the Michigan Supreme Court to bar an ERISA plan participant's attempt to rescind a waiver on the ground that consideration was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

not first returned to the Plan. *See Samms v. Quanex Corp.,* No. 95-2173, 1996 WL 599821 (6th Cir. Oct.17, 1996). The "tender-back" rule is a well-established rule of contract law. *See McDonald v. Zinn Drywall,* 134 Mich.App. 270, 274-75, 350 N.W.2d 864, 866-67 (1984) (holding that where a plaintiff attempts to set aside a workers' compensation redemption settlement, a plaintiff must, in a case alleging mutual mistake, tender a return of the consideration); *Stefanac v. Cranbrook Educ. Cmty.,* 435 Mich. 155, 176-77, 458 N.W.2d 56, 66 (1990) (holding "that a plaintiff must, in all cases where a legal claim is raised in contravention of an agreement, tender the consideration recited in the agreement prior to or simultaneously with the filing of suit.... Although seemingly harsh, we find that this rule is necessary in order to preserve the stability of release agreements"); *Leahan v. Stroh Brewery Co.,* 420 Mich. 108, 112-13, 359 N.W.2d 524, 525-26 (1984) (holding that the plaintiff must return both parties to the financial status quo before commencing suit to revoke a release agreement). *See also Small v. Chemlawn Corp.,* 584 F.Supp. 690, 693 (W.D.Mich.1984), *aff'd,* 765 F.2d 146 (6th Cir.1985) ("Where an accord has been followed by satisfaction, a plaintiff must tender back to the defendant that which he received in return for the accord before commencing suit.").

*4 As for the law concerning mutual mistake, the defendant correctly observes, and the plaintiff does not dispute, that Michigan has not found a unilateral mistake to be a sufficient basis to revoke his waiver. *See Solo v. Chrysler Corp.,* 408 Mich. 345, 292 N.W.2d 438 (1980) (citing Larson, *Workmen's Compensation,* § 81.52, at 15-545 & 15-546); *McDonald,* 134 Mich.App. at 273, 350 N.W.2d at 866 (noting that the Court has the power "to rescind a workers' compensation redemption agreement on the ground of mutual mistake"); *Badon v. Gen. Motors Corp.,* 679 F.2d 93, 96 (6th Cir .1982) ("Furthermore, the parties were not, as Badon suggests, laboring under any mutual mistake of fact. Any mistake regarding the possible consequences of the redemption was unilateral on Badon's part.").

There can be little doubt that MetLife, as the plan administrator, could have relied--indeed, as a fiduciary, ought to have relied--on the waiver of benefits signed by the plaintiff and witnessed by his attorney. The only basis the plaintiff proffered in his demand letter to MetLife for ignoring the EDB Waiver was his self-serving proclamation that no consideration was received for the EDB Waiver, a rationale not supported by the administrative record. Against this meager showing, the administrator was confronted with evidence of (1) an EDB Waiver form signed by the plaintiff, (2) that was witnessed by the plaintiff's attorney, (3) whose execution was completed on the record before a magistrate, (4) who himself confirmed the plaintiff's consent to the Redemption. With these materials before it, MetLife drew the only reasonable conclusion available, namely that the waiver was properly made, and the problem with the settlement was not of General Motors' making. *See A.R.* at 173 ("We now know that the employee is very confused.... If he didn't explain the EDB waiver properly to the employee, that will be Mr. Keller's problem.").

The plaintiff's basis for urging otherwise is testimony from the Redemption hearing cited out of its proper context. The cited testimony refers to the separate issue of the manner in which the settlement funds will be characterized for tax and future disability offset purchases. That aspect of the settlement issue is quite separate from the EDB Waiver, and certainly does not stand for the proposition that the plaintiff did not receive consideration for any component of the settlement. Even if that testimony was helpful to the plaintiff, all it would mean is that plaintiff's counsel failed to properly advise his client as to the ramifications of the waiver. Having let the fifteen-day revocation period expire, the plaintiff has no recourse against this defendant for his unilateral misunderstanding.

IV.

The Court has determined that the decision of the Plan administrator was reasonable in light of the evidence contained in the administrative record.

Accordingly, it is ORDERED that the defendant's Motion to Affirm the Administrator's Decision [dkt # 19] is GRANTED. The defendant's Motion for Summary Judgment [dkt # 9] is DENIED as moot.

*5 It is further ORDERED that the plaintiff's complaint is DISMISSED WITH PREJUDICE.

2003 WL 21488690 (E.D.Mich.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

3

215 F.3d 1326 (Table)
**Unpublished Disposition**

(Cite as: 215 F.3d 1326, 2000 WL 571933 (6th Cir.(Tenn.)))
**C**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

Charles E. HALVORSON, Plaintiff-Appellant,
v.
BOY SCOUTS OF AMERICA, doing business as
West Tennessee Area Council, Inc.,
Defendant-Appellee.

No. 99-5021.

May 3, 2000.

On Appeal from the United States District Court for the Western District of Tennessee.

Before NELSON and DAUGHTREY, Circuit Judges, and DOWD, District Judge. [FN*]

> FN* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

NELSON, J.

**\*\*1** This is an appeal from a summary judgment in favor of the Boy Scouts of America ("BSA") and an associated entity, the West Tennessee Area Council ("WTAC"), on a variety of statutory claims based primarily on allegations of employment discrimination. [FN1] The complaint alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* For the reasons stated below we shall affirm the judgement entered by the district court.

> FN1. The complaint in this case was captioned "Charles E. Halvorson v. Boy Scouts of America, d/b/a/ West Tennessee Area Council, Inc." The motion for summary judgment appears to have been filed by

WTAC only ("Defendant, the West Tennessee Area Council of the Boy Scouts of America, by and through its attorneys, hereby files its Motion for Summary Judgment and respectfully requests that Court to enter Summary Judgment in favor of the Defendant ....") but the motion argues that summary judgment should be entered for both WTAC and BSA. In its opinion, the district court addressed the motion as though it were from both defendants. We shall follow the district court's lead on this point.

I

The plaintiff, Charles E. Halvorson, worked as senior district executive for WTAC, a local council chartered to carry out the programs of BSA in West Tennessee. BSA is a congressionally chartered non-profit organization headquartered in Irving, Texas. BSA does not conduct local operational activities itself, relying instead on local councils such as WTAC to do so. The local councils are separately incorporated, financed and managed.

Halvorson resigned from WTAC on January 24, 1997. The events leading up to the resignation may be summarized as follows.

On January 22, 1997, Halvorson underwent an annual performance review with his supervisor, Field Director Ed Harvey, and Scout Executive Dan Johnson, the highest-ranking person in WTAC. In the course of the meeting Johnson inquired as to Halvorson's health, knowing that Halvorson suffers from diabetes. Halvorson assured Johnson that he was fine, although he seemed upset and emotional. The upshot of the review was that Halvorson's job performance was found wanting in six areas. The three men agreed on a probationary improvement plan.

The following day, January 23rd, Halvorson complained to Harvey of back and neck pain. This was not a new complaint. Halvorson had suffered from a back and neck ailment for quite some time, but it had not recently been a problem. Harvey excused Halvorson from attending a large scout banquet that evening, but Halvorson attended anyway. There is some evidence that on this same day Halvorson told people in the office that he was resigning.

On the morning of January 24, 1997, Halvorson told

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Harvey that he wanted to take short-term medical leave because of the back and neck pain he was experiencing. There is also some evidence that he felt the pressure of the probationary plan was too much. He informed Harvey that he needed to go to his doctor's office to pick up the paperwork necessary for taking leave. Harvey called Johnson to tell him of Halvorson's situation. According to Harvey, Johnson asked him to keep Halvorson in the office until Johnson could consult with the national BSA office on the matter. Johnson denies this allegation. As it happened there was a good deal of work to be done in the office because of the banquet the night before, and Halvorson had no opportunity to leave.

**2 Around 3 o'clock that afternoon, Halvorson met again with Johnson and Harvey. Johnson apparently refused to consider letting him go on medical leave, saying, "We're not playing that game." Halvorson claims he believed he had to resign or be fired. According to Halvorson, his agitated state led him to agree to resignation without really knowing what was going on. Johnson explains that resignation was presented to Halvorson as an alternative to working under the probationary plan that was causing Halvorson to experience elevated levels of stress. In the end, Halvorson prepared a letter of resignation. Johnson and Halvorson then went to a notary public and executed a "Resignation and General Release Agreement."

Halvorson subsequently brought suit, with the result described above. The district court relied on the following grounds in granting judgment for the defendants. First, the court found that Halvorson was employed by WTAC alone and that BSA was not subject to suit as it was not Halvorson's employer. Second, the court found that Halvorson's ADA, FMLA, and ERISA claims were waived by his knowing and voluntary execution of a release at the time of his resignation. Finally, the court concluded that the ADEA and FMLA claims against WTAC were foreclosed because the Council did not have the statutorily prescribed minimum number of employees.

## II

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. See Rule 56(c), Fed. R. Civ.P. We review a district court's decision to grant summary judgment *de novo*. See *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir.1998). Although the facts and the inferences to

be drawn therefrom are viewed in a light most favorable to the non-movant, see *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir.1999), the non-movant must produce more than "a mere scintilla" of evidence giving rise to a genuine issue of material fact. There must be evidence on which a jury could find for the non-movant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

BSA argues on appeal that it bears no liability on any of the claims because it was not Halvorson's employer. Rather, it contends, Halvorson was an employee of WTAC, a separate and distinct entity. We find it unnecessary to reach this issue, because we are satisfied that BSA, like WTAC, could not properly be held liable in any event.

### A. Waiver of ADA, FMLA, and ERISA Claims Through the Release

As part of his resignation agreement, Halvorson signed a release waiving his claims against WTAC. Although BSA was not a party to the agreement, the terms of the release are expansive enough to foreclose these claims against BSA as well. [FN2] If valid, this release waives Halvorson's claims against both organizations under the ADA, FMLA, and ERISA. [FN3]

> FN2. The release reads as follows: *"General Release and Discharge.* Except for those obligations created by or arising out of this Agreement, the Employee ... hereby covenants not to sue and fully releases and discharges the Company, and any parent or subsidiary or affiliates of the Company, past and present, and each of them, as well as its directors, officers, agents, or any other person or firm associated with the Company, and each of them, with respect to and from any and all claims, wages, commissions, benefits, demands, rights, liens, agreements, contracts, covenants, actions, suits and causes of action, costs, expenses, damages, and any and all other liabilities and claims of whatever kind or nature in law or in equity, whether now known or unknown, and whether or not concealed or hidden, which the Employee may now own or hold or have any right to as against the Company, arising out of or in any way connected with the Employee's employment relationship with the Company and the Employee. This General Release is intended to include also a release of all claims arising out of the Employee's voluntary resignation from employment or any other transactions, occurrences, acts or omissions, or any other loss, damage, or injury whatever,

now known or unknown, resulting from any alleged act or omission by or on the part of the Company or any other person, firm, or association, related to it, including but not limited to Title 7 of the Civil Rights Act of 1964, including the ADA, FMLA, and/or the Age Discrimination Employment Act, any statutes related to employment in the State of Tennessee, severance pay, sick leave, holiday pay, vacation pay, life or group medical insurance, or any other fringe benefit of the Company."

FN3. The release cannot operate to waive the ADEA claim because it does not meet the strict requirements of 29 U.S.C. § 626(f).

Halvorson contends that the release is in fact invalid. His argument rests on the facts that his head and neck were hurting; that he had not been able to leave work to pick up the paperwork from his doctor to support his request for medical leave; and that he believed he had to sign the agreement or be fired. He was in an agitated and anxious state of mind that caused him to sign the agreement involuntarily, he says, and without understanding its effect.

**3 A release is valid if it was knowingly and voluntarily made under circumstances not indicating any overreaching or exploitation. See *Mararri v. WCI Steel, Inc.,* 130 F.3d 1180, 1184 (6th Cir.1997). Halvorson is, and was at the time, a well-educated and experienced individual. Although he emphasizes that he was upset because he was not able to go to his doctor's office that day, he testified that no one told him he was not allowed to go and that the source of his agitation was internal. By his own admission, Halvorson was not told he had to sign the release or be fired. Rather, the agreement was presented as an alternative to working under the probationary performance improvement plan. Halvorson was given a chance to read through the document, and he later remembered asking about a reference to advice of counsel. After reading the agreement, he wrote his own letter of resignation at his own desk. He and Johnson then went to a notary public, where both signed the agreement in the presence of the notary. These circumstances show that the release was signed voluntarily and knowingly.

Any possible question as to the making of the agreement is overcome, moreover, by its subsequent ratification. An agreement that is invalid due to duress or coercion can be ratified by retention of the consideration paid. See *Howlett v. Holiday Inns, Inc.,*

120 F.3d 598 (6th Cir.1997). After signing the agreement at issue here, Halvorson was advised by counsel that he might have signed under duress or coercion. He nonetheless retained the extra severance money he had been granted in return for signing the agreement (90 days of pay as opposed to the usual 30 days). The release was thus ratified, and Halvorson's ADA, FMLA, and ERISA claims against both WTAC and BSA are foreclosed.

*B. ADEA Claim*

This leaves Halvorson's ADEA claim, which was not effectively waived by the general release. See 29 U.S.C. § 626(f). Although the district court decided among other things that BSA was not liable because it was not Halvorson's employer and WTAC was not liable because it did not have the requisite number of employees, we do not need to reach these issues; we are satisfied that there could be no ADEA liability here in any event.

An age discrimination case based on circumstantial evidence requires a *prima facie* showing that: (1) the plaintiff was between the ages of 40 and 70; (2) the plaintiff was qualified for the particular position; (3) the plaintiff suffered an adverse employment action; and (4) the plaintiff was replaced by a younger individual. See *Barnhart v. Pickrel, Schaeffer & Eberling Co.,* 12 F.3d 1382, 1390 (6th Cir.1993). Once a *prima facie* case has been made, the burden shifts to the defendant to advance a legitimate, nondiscriminatory reason for the challenged employment decision. See *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir.1994) (applying *McDonnell- Douglass* burden-shifting framework to age discrimination). If such a reason is offered, the plaintiff has the burden of offering evidence sufficient to show that the reason given was a mere pretext for age discrimination. See *id.* at 1083, and *Scott,* 160 F.3d at 1126. If the plaintiff fails either to make out a *prima facie* case or to present sufficient evidence of pretext, summary judgment for the defendant is in order.

**4 Here, Halvorson has failed to present evidence of pretext. Halvorson was offered resignation as an alternative to improving his performance under the probationary plan, and the choice was clearly his. The record contains no evidence that Johnson wanted to remove Halvorson because of his age.

AFFIRMED.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

215 F.3d 1326 (Table)
**(Cite as: 215 F.3d 1326, 2000 WL 571933, \*\*4 (6th Cir.(Tenn.)))**

215 F.3d 1326 (Table), 2000 WL 571933 (6th Cir.(Tenn.)) Unpublished Disposition

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works